CONNECTICUT GENERAL LIFE INSURANCE
COMPANY,

                               No. 3:12-cv-01456 (MPS)

       Plaintiff,

       v.

HOUSTON SCHEDULING SERVICES, INC. and
U.S. IMAGING, INC.,

       Defendants.

## MEMORANDUM OF DECISION

Plaintiff Connecticut General Life Insurance Company ("Plaintiff" or "CGLIC") brings this action against Defendants Houston Scheduling Services, Inc. ("HSS") and U.S. Imaging, Inc. ("USI" and collectively, "Defendants") under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), seeking equitable relief for a fraudulent billing scheme Defendants allegedly perpetrated against CGLIC. Defendants have moved to compel arbitration and stay this action under 9 U.S.C. §§ 3 and 4, and Federal Rule of Civil Procedure 12(b)(3) [Dkt. # 30]. Defendants' Motion turns on two issues: (1) whether Plaintiff's claim falls within the scope of the arbitration clause at issue in this case, and (2) whether Defendants, who are not signatories to the contracts containing the arbitration clause, may compel Plaintiff, a beneficiary of those contracts but not a signatory, to arbitrate its claim. For the reasons discussed below, the Court finds that Plaintiff's claim falls within the scope of the arbitration clause and Defendants can compel Plaintiff to arbitrate that claim.

## I. Background

The following recitation of the facts is taken from the Complaint, documents incorporated into the Complaint, and other materials in the record.[1] "CGLIC is a nationwide health insurer [that] offers and operates health plans as a claims administrator on behalf of self-funded employer plans and also acts as an insurer for employer-sponsored plans, including regional and national employers with employees in the state of Texas." (Compl. ¶ 10 [Dkt. # 1].) CGLIC offers health plans that provide benefits for "in-network" services rendered by a network of "participating providers" and "out-of-network" services rendered by "non-participating providers." (*Id.* ¶ 11.) "Participating providers" generally contract with CGLIC to provide medical services to plan members for a contractually-set fee, and "non-participating providers" provide medical services to plan members, but at a rate they are free to set themselves. (*Id.*) Services provided by non-participating providers are often provided at a higher rate than services provided by participating providers.

CIGNA Healthcare of Texas, Inc., an affiliate of CGLIC, entered into contracts with various outpatient imaging centers in the State of Texas. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Compel Arb. at 2 [Dkt. # 37].) Under these contracts, the outpatient imaging centers became participating providers that provided in-network services to CGLIC plan members for a set rate. (*Id.*) While none of the parties in this action are signatories to those contracts, they are all affiliated with the signatories. More importantly, as CGLIC conceded at oral argument, it is an "intended third-party beneficiary" of the contracts and is bound by those contracts. (*See* Pl.'s

---

[1] On a motion brought under Rule 12(b)(3), the Court is permitted to consider facts outside the pleadings, *see Carrano v. Harborside Healthcare Corp.*, 199 F.R.D. 459, 460 n.1 (D. Conn. 2001) ("Analysis under Rule 12(b)(3) … permits the district court to consider facts outside of the pleadings."), but "the court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits" and "draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff, who has the burden of showing that venue in the forum is proper." *Sawch v. Life Techs. Corp.*, No. 3:11-cv-1359 (AWT), 2012 U.S. Dist. LEXIS 132858, *1 (D. Conn. Sept. 18, 2012) (internal citations and quotation marks omitted).

Second Supp. Mem. of Law in Opp'n to Defs.' Mot. to Compel Arb. at 7 [Dkt. # 82] ("As

CGLIC noted at oral argument in this case … the contracts at issue bind CGLIC as a 'CIGNA

Affiliate'…."); *see also* Compl. ¶¶ 26-28 (alleging that CGLIC was harmed by the alleged

fraudulent billing scheme because it was not charged the in-network rates set forth in the

contracts between CIGNA Healthcare of Texas, Inc. and the imaging centers).)  USI owns and

operates the imaging centers and uses HSS to handle its scheduling and billing needs.  (Compl.

¶¶ 13-14.)

The contracts contain the following arbitration provision:

> Disputes arising with respect to the performance or interpretation of the
> Agreement shall be submitted to the Medical Director for review and
> resolution.
>
> *        *        *
>
> If Provider is not satisfied with such resolution and to the extent permitted
> by law, the matter in controversy shall be submitted to a dispute resolution
> entity, or to a single arbitrator selected by the American Arbitration
> Association, as the parties shall agree within 60 days of the last attempted
> resolution.

(Ancillary Provider Managed Care Agreement, Section III.N, attached as Ex. A to Defs.' Mem.

of Law in Supp. of Mot. to Compel Arb. [Dkt. # 31].)[2]

---

[2] In support of their Motion, Defendants attached an "exemplar" contract, which contains the cited arbitration provision, and a separate contract (the "South Loop Contract") entered into by one of the imaging centers, which contains an arbitration clause that is essentially identical to the exemplar contract.  (*See* South Loop Contract, Section 6.3, attached as Ex. B to Defs.' Mem. of Law in Supp. of Mot. to Compel Arb. ("Disputes that might arise between the parties regarding the performance or interpretation of the Agreement….").)  Both the exemplar contract and the South Loop Contract were signed by CIGNA Healthcare of Texas, Inc.

Plaintiff did not contest the authenticity of the exemplar contract or Defendants' representation that all of the contracts between CIGNA Health Care of Texas, Inc. and the imaging centers are substantially similar, if not identical, to the exemplar contract.  (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Compel Arb. at 7-8 (conceding that the imaging centers entered into the contracts attached to the Ramirez Affidavit and not questioning the authenticity of those contracts).)  Accordingly, for the purposes of this decision, the Court assumes that all the contracts at issue mirror the exemplar contract.

CGLIC alleges that "[f]rom approximately June 28, 2010 to approximately December 26, 2011, Defendants submitted fraudulent claims to CGLIC identifying HSS as not only the billing entity but also, falsely, as the rendering provider of imaging services." (Compl. ¶ 19.) "In addition to misrepresenting itself as an imaging service provider, HSS also improperly billed CGLIC at higher out-of-network rates for services actually provided by USI, a CGLIC in-network provider. This resulted in CGLIC paying substantially more than it should have for the imaging services." (*Id.* ¶ 21.) "Through this fraudulent and wrongful billing scheme," Plaintiff alleges that "Defendants received approximately $1.4 million in claims payments from CGLIC to which it is not entitled." (*Id.* ¶ 44.) Notably, CGLIC does not allege that the services were never rendered, only that Defendants' *billing* of those services was fraudulent.

Plaintiff initiated this action under 29 U.S.C. § 1132(a)(3), which provides as follows: "A civil action may be brought … by a participant, beneficiary, or fiduciary … to obtain other appropriate equitable relief (i) to redress … violations or (ii) to enforce any provisions of this title or of the plan…." *See Coan v. Kaufman*, 457 F.3d 250, 262 (2d Cir. 2006) ("[S]ection 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which the Supreme Court has described as a 'catchall' remedial section offer[s] appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy. Unlike section 502(a)(2), section 502(a)(3) permits ERISA [fiduciaries] to bring suit for individual remedies; but relief under section 502(a)(3) must be 'equitable.'" (internal quotation marks and citations omitted)). Invoking this provision, Plaintiff seeks to recover the amounts paid to Defendants as part of their alleged fraudulent billing scheme. (*Id.* ¶ 51.)

Plaintiff has been inconsistent, however, in how it alleges that these amounts should be calculated. In its Complaint, Plaintiff alleges that Defendants were required to bill CGLIC at in-

network rates but, instead, Defendants "improperly billed CLGIC at higher out-of-network rates" which "resulted in CGLIC paying substantially more than it should have for the imaging services." (Compl. ¶ 21.) Based on its Complaint, Plaintiff appears to calculate any possible damages based on the difference between the in-network and out-of-network rates. At oral argument, however, Plaintiff's counsel asserted that the damages sought, approximately $1.4 million, represent the entire amount paid by CGLIC to Defendants, not simply the difference between the in-network and out-of-network rates, and counsel argued that Plaintiff is entitled to the entire amount paid because § 1132(a)(3) permits equitable disgorgement.[3]

Defendants move to compel arbitration on the grounds that Plaintiff's claim is covered by the arbitration provision in the CIGNA Healthcare of Texas, Inc./imaging center contracts.

## II.     Discussion

### A.      Applicable Legal Standards

The Federal Arbitration Act "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008); *see also* 9 U.S.C. § 2 ("[A] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable…."). "To determine whether an action should be dismissed in favor of arbitration, we consider four factors: (1) whether the parties agreed to arbitrate; (2) the scope of the arbitration agreement; (3) whether, if federal statutory claims are asserted, Congress intended those claims to be nonarbitrable; and (4) whether, if some but not all of the

---

[3] Although there is case law holding that "disgorgement of profits earned on wrongfully withheld benefits is an equitable remedy under ERISA § 502(a)(3) [29 U.S.C. § 1132(a)(3)]," *Dobson v. The Hartford Fin. Servs. Grp., Inc.*, No. 3:99-cv-2256 (JBA), 2002 U.S. Dist. LEXIS 17682, at *6-7 (D. Conn. Aug. 2, 2002), it is not clear whether a party may be entitled to disgorgement of the entire amount paid in a situation like this. The Court takes no position on that issue.

claims in the case are arbitrable, the case should be stayed pending arbitration." *McAllister v. Conn. Renaissance, Inc.*, 496 Fed. App'x 104, 106 (2d Cir. 2012). In this case, only the first two factors are at issue.[4]

"Typically, the party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." *Helenese v. Oracle Corp.*, No. 3:09-cv-351 (CFD), 2010 U.S. Dist. LEXIS 15071, at *8 (D. Conn. Feb. 19, 2010). Where a claim is subject to arbitration, the Court may either stay the action or dismiss it. *See Pearl Seas Cruises, LLC v. Irving Shipbuilding Inc.*, No. 3:10-cv-1801 (JBA), 2012 U.S. Dist. LEXIS 46162, at *15 (D. Conn. Mar. 30, 2012) ("Under 9 U.S.C. § 3, a court, 'upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.' This mandate to stay the action also includes the right to dismiss the action.").

**B.      Plaintiff Must Arbitrate Its Claim against Defendants**

Defendants' Motion presents two issues relating to whether or not this case is arbitrable: (1) Does the claim asserted by Plaintiff fall within the scope of the arbitration clause, i.e., is it within the subject matter that the parties agreed to arbitrate? and (2) may Defendants, who are not signatories to the contracts containing the arbitration provision, enforce the arbitration provision against Plaintiff, who, though not a signatory either, has conceded that it is an intended beneficiary of the contracts containing the arbitration clause?

**1.      Plaintiff's Claim Falls within the Scope of the Arbitration Clause**

---

[4] Although Defendants discussed all four factors, CGLIC did not address the third and fourth factors in their briefs.

With respect to the first issue, the Second Circuit instructs that the Court must first determine whether the arbitration clause is a "broad clause" or a "narrow clause." *Hartford Aircraft Lodge 743 v. Hamilton Sundstrand Corp.*, 213 Fed. App'x 31, 32 (2d Cir. 2007) ("At the outset, we ordinarily decide whether the clause is 'broad' or 'narrow.'") If the Court finds that the clause is a "broad clause," then there is a "presumption of arbitrability" and "arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (internal quotation marks omitted). If the Court finds that the clause is a "narrow clause," then the Court is to determine whether the claim pled on the face of the complaint falls within the literal terms of the clause. *See Louis Dreyfus*, 252 F.3d at 224 ("[I]f reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." (internal citations and quotation marks omitted)).

There are many cases within the Second Circuit at both the Court of Appeals and District Court levels that address this broad/narrow distinction in a variety of contexts. Thus, there are several cases holding that clauses calling for arbitration of disputes that involve the "interpretation" of an agreement are narrow, and several cases holding that clauses that call for arbitration of "any and all controversies" "arising out of" a contract are broad. *See, e.g.*, *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 649, 654 (2d Cir. 2004) (holding that an arbitration clause requiring arbitration of "any controversy, claim, or dispute between the Parties arising out of or relating in any way to this

Agreement" is broad); *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004) (holding that an arbitration clause requiring arbitration of "any and all differences and disputes of whatsoever nature arising out of" the Agreement is broad); *Cornell Univ. v. UAW Local 2300,* 942 F.2d 138, 140 (2d Cir. 1991) (finding an arbitration clause to be narrow where it required arbitration of "any matter involving the interpretation or application" of the Agreement). There is also a Second Circuit case holding that a contractual provision conferring on arbitrators "the power to decide all differences arising between the parties to this agreement as to interpretation, application or performance of any part of this agreement" is a broad clause. *Abram Landau Real Estate v. Benova*, 123 F.3d 69, 71 (2d Cir. 1997). The Court was unable to find a Second Circuit case, however, involving language that is substantially identical to the arbitration clause at issue here: "Disputes arising with respect to interpretation and performance of the Agreement…." And because the broad/narrow classification in these cases often turns on minor differences in the language of the arbitration clause, the body of Second Circuit case law on this topic does not point clearly in either direction in this case.

Fortunately, a recent case from the Eastern District of Pennsylvania provides a handy compass, as it involved not only the same language as that found in the arbitration clause here but an affiliate of CGLIC. In *CardioNet, Inc. v. CIGNA Health Corp.*, No. 13-cv-191, 2013 U.S. Dist. LEXIS 72859 (E.D. Pa. May 23, 2013), the District Court for the Eastern District of Pennsylvania considered a motion to compel arbitration brought by CIGNA Health Corporation against two service providers, and concluded, *at CIGNA Health Corporation's urging*, that arbitration language that is identical to one of the clauses in this case was "broad," under a

8

broad/narrow classification scheme that mirrors the one used by the Second Circuit.[5] In that case, CIGNA Health Corporation entered into service agreements with two suppliers of outpatient heart services. *Id.* at *2. Those agreements included arbitration provisions identical to the South Loop Contract: "*Disputes* that might arise between the parties *regarding the performance or interpretation of the Agreement*" that could not be resolved through the internal dispute resolution process were to be submitted to arbitration.[6] *Id.* at *10 (emphasis added). When CIGNA Health Corporation decided that the cardiac services were "experimental, investigational and unproven" and would no longer be covered, the service providers brought suit to challenge that decision. *Id.* at *2-3. CIGNA Health Corporation moved to compel arbitration and to dismiss the complaint, or in the alternative, to stay the action pending arbitration. *Id.* at *5. In its brief, CIGNA Health Corporation argued that "all of Plaintiffs' claims should be dismissed *because they are within the scope of the broad arbitration provision in the [agreements]*." (CIGNA Health Corp. Br. at 12, *CardioNet*, 2013 U.S. Dist. LEXIS 72859 (E.D. Pa. May 23, 2013) (emphasis added).) The District Court, relying on Third Circuit case law, agreed that the arbitration provision was broad. *Id.* at *14.

---

[5] *Compare Townsend v. Pinnacle Entm't, Inc.*, 457 Fed. App'x 205, 209 (3d Cir. 2012) ("When phrases such as 'any claim arising out of' appear in an arbitration provision, they are given a broad construction….") and *RCM Techs., Inc. v. Constr. Servs. Assocs.*, 149 F. Supp. 2d 109, 113 (D.N.J. 2001) (noting that an arbitration clause that applied to "disputes as to interpretation" is narrow) *with Paramedics Electromedicina*, 369 F.3d at 649 (holding that an arbitration clause requiring arbitration of "any controversy, claim, or dispute between the Parties arising out of or relating in any way to this Agreement" is broad) and *Cornell Univ.*, 942 F.2d at 140 (finding an arbitration clause to be narrow where it required arbitration of "any matter involving the interpretation or application" of the Agreement); *see also Simpson v. Wood*, No. 07-cv-47, 2010 U.S. Dist. LEXIS 1926, at *9 (D.V.I. Jan. 7, 2010) (citing case law from the Eastern District of New York and the Second Circuit when conducting the broad/narrow analysis of an arbitration provision).

[6] *See supra* n.2 (noting that the South Loop Contract and exemplar contract contain arbitration provisions that are essentially identical).

*CardioNet* is instructive for two reasons. First, the arbitration language in that case is identical to the language of the contracts at issue here. Indeed, CIGNA entities drafted both the *CardioNet* contracts and the contracts at issue here. (*See* Ancillary Services Agreement [Dkt. # 7-1], *CardioNet*, 2013 U.S. Dist. LEXIS 72859 (E.D. Pa. May 23, 2013); South Loop Contract). In fact, it appears that the *CardioNet* contracts and the South Loop Contract were drafted based on the same CIGNA template. (*See id.* (both contracts include the same "ANC2005MCA.US" file designation on each page and both contracts are largely identical).) In other words, CIGNA Health Corporation successfully argued that the arbitration provision *it drafted* – the same provision at issue here – was broad. Thus, the only other case that the Court found involving the same language, from essentially the same contract, held that the language is broad.

Second, Plaintiff is judicially estopped from arguing that the arbitration provision at issue here is narrow based on CIGNA Health Corporation's successful argument in *CardioNet* that the same language is broad. The purpose of judicial estoppel is "to prevent improper use of judicial machinery" and "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Intellivision v. Microsoft Corp.*, 484 Fed. App'x 616, 619 (2d Cir. 2012); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

Judicial "estoppel only applies when a tribunal in a prior proceeding has accepted the claim at issue by rendering a favorable decision;" thus, the doctrine is limited to "situations where the risk of inconsistent results … is certain." *Simon v. Safelite Glass Corp.*, 128 F.3d 68,

10

72 (2d Cir. 1997). Here, the risk of inconsistent results is certain because a related CIGNA entity successfully argued in a prior proceeding that the language at issue in this case is broad, and to find that it is narrow here would be inconsistent with the earlier decision. Although the plaintiff in this action is CGLIC and the plaintiff in *CardioNet* was an affiliated entity, CIGNA Health Corporation, Plaintiff is nevertheless bound by CIGNA Health Corporation's position in *CardioNet*. Judicial estoppel is an equitable doctrine, *Intellivision*, 484 Fed. App'x at 619, and it is equitable to treat CGLIC and CIGNA Health Corporation as the same party for purposes of judicial estoppel because (1) CGLIC conceded that it is a "CIGNA Affiliate"; (2) CGLIC conceded that it is bound by the contracts entered into by another CIGNA affiliate, i.e., CIGNA Healthcare of Texas, Inc. (*see* Pl.'s Second Supp. Mem. of Law in Opp'n to Defs.' Mot. to Compel Arb. at 7); and (3) CGLIC's claim, at least as alleged in the Complaint, is premised on the rates set forth in the CIGNA Healthcare of Texas, Inc./imagining center contracts. If anything, allowing CGLIC to stand in the shoes of one CIGNA affiliate for purposes of asserting its claim but refusing to bind CGLIC to another CIGNA affiliate's earlier position with respect to the same arbitration language would be inequitable.

On the basis of *CardioNet*, and on the basis of the doctrine of judicial estoppel, the Court finds that the arbitration clause in this case is broad. Accordingly, there is a presumption of arbitrability, and "arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Louis Dreyfus*, 252 F.3d at 224 (internal quotation marks omitted). That does not end the analysis, however, because even a broad arbitration clause does not embrace every dispute that might arise between the parties. For the reasons set forth below, the Court finds that the arbitration clause at issue here does encompass this dispute.

As noted, Plaintiff brings its claim under a provision of ERISA, 29 U.S.C. § 1132(a)(3), that allows a plan sponsor or fiduciary to bring claims for equitable relief. Although ERISA provides the legal hook for the claim, the allegations of the Complaint demonstrate that the cause of action rests on the contracts entered into by CIGNA Healthcare of Texas, Inc. and the imaging centers. For example, Plaintiff alleges that HSS "improperly billed CGLIC at higher out-of-network rates for services actually provided by USI, a CGLIC in-network provider. This resulted in CGLIC paying substantially more than it should have for the imaging services." (Compl. ¶ 21.) Plaintiff's Complaint then includes an example of the alleged fraudulent billing scheme: "Defendants engaged in this billing fraud so that they could charge CGLIC, in this instance, $4,340.00 for the MRI and $655.00 for the CT scan, as opposed to the in-network rate for San Antonio Diagnostic Imaging of $597.28 for the MRI and $382.28 for the CT scan." (*Id.* ¶ 26.) These allegations illustrate that the claim is based on Defendants' obligation to charge the in-network rates set forth in the contracts, i.e., the contract is the source of the duty element of the claim pled in the Complaint. It is the breach of a duty arising from the contracts, i.e., a duty to charge in-network rates, that is the core of the cause of action. The dispute, then, implicates "performance" of the contract.

At oral argument, Plaintiff's counsel attempted to recast the claim as one based solely on the fact that HSS, which is not a licensed healthcare provider and allegedly did not perform any of the medical services, fraudulently billed CGLIC. In Plaintiff's view, such conduct warrants a restitutionary remedy – which Plaintiff calls "disgorgement" – consisting of every dollar CGLIC paid to Defendants for medical services. This characterization is at odds with the language of the Complaint accusing Defendants of "improper bill[ing] at higher out-of-network rates for services actually provided by … an in-network provider," (Compl. ¶ 21), but even if the Court were to

accept it, the parties' dispute nevertheless would fall within the arbitration clause because Defendants would inevitably assert defenses that implicate the terms of the contracts.

29 U.S.C. § 1132(a)(3) permits a plan sponsor or fiduciary to bring claims "to obtain other appropriate equitable relief," including claims by insurers seeking reimbursement or recoupment of overpayments. *See Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 661 (2d Cir. 2013) (holding that an insurer's counterclaim to recoup overpayments made to a claimant was an equitable claim permitted under § 1132(a)(3)). Because Plaintiff's claim is an equitable one, Defendants are entitled to assert equitable defenses, including setoff. *See, e.g.*, *Crabtree v. Cent. Fla. Invs., Inc.*, No. 6:12-cv-656-Orl-36TBS, 2012 U.S. Dist. LEXIS 177354, at *18 (M.D. Fla. Oct. 3, 2012) (holding that a defendant may assert setoff as an affirmative defense to a claim under 29 U.S.C. § 1132(a)(3)). Thus, even if Plaintiff is seeking the entire amount paid to Defendants, Defendants will surely argue, among other things, that they are entitled to set off any amounts owed with the contractually specified in-network fees that Plaintiff otherwise would have had to pay for the medical services provided. In that case, even if the four corners of the "claim" did not implicate the contract, the "dispute" – which is the unit of arbitrability specified in the arbitration clause – plainly would. (*See* Ancillary Provider Managed Care Agreement, Section III.N, ("*Disputes* arising with respect to the performance or interpretation of the Agreement….") (emphasis added).) Because Defendants inevitably will defend any claim that they must return the full amount paid to them by arguing that they should be allowed to retain at least what the service providers were entitled to under the contracts, the "dispute" necessarily implicates "performance" and "interpretation" of the contract.

### 2. Defendants May Enforce the Arbitration Clause against Plaintiff

Ordinarily, a party may not be required to arbitrate unless it has agreed to do so. *See Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 479 (1989) ("Arbitration under the [FAA] is a matter

of consent, not coercion…."); *AT&T Techs. v. Communc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). It is undisputed that, in this case, neither Defendant is a party to the contracts containing the arbitration provisions. Rather, the imaging centers themselves, which are owned by Defendant USI, (*see* Defs.' Mem. of Law in Supp. of Mot. to Compel. Arb. at 1 ("Forming the basis of CGLIC's claims, yet only cryptically referred to in its complaint, are written agreements between CIGNA Healthplan of Texas, Inc. ("CIGNA") and outpatient medical imaging centers owned by USI.")), are the actual signatories to these contracts. Defendant HSS is also alleged to be owned and controlled by Defendant USI. (*See* Compl. ¶ 16 ("USI created and controls HSS as if they are for all practical purposes one company.").)

Plaintiff's relationship to those contracts is not quite as clear. Plaintiff itself is not the corporate entity that entered into the contracts, but at oral argument, Plaintiff conceded that it was an "intended third-party beneficiary" of those contracts. Further, in a supplemental brief filed after argument, Plaintiff conceded that it was bound by the terms of the contracts. (*See* Pl.'s Second Supp. Mem. of Law in Opp'n to Defs.' Mot. to Compel Arb. at 7.) The contracts include language referring, at several places, to "CIGNA Affiliate[s]," a term that is defined broadly[7] and would include Plaintiff, as counsel conceded at oral argument. But the arbitration clause itself references only "the parties" – a term that is not defined but, according to its plain meaning, likely refers to the actual signatories, i.e., the imaging centers and CIGNA Healthplan of Texas, Inc. Nonetheless, under well-established case law, a third-party beneficiary to a contract is bound by the terms of that contract, and there are several cases finding that such beneficiaries are

---

[7] (*See* Ancillary Provider Managed Care Agreement, Section I. ("CIGNA Affiliate means any direct or indirect subsidiary of CIGNA Corporation.").)

specifically bound to arbitrate under arbitration provisions in the contract that benefit them. *See*

*Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 121 (2d Cir. 1991) ("[B]eneficiaries

are bound by principal's agreement to arbitrate when they claim no present entitlement to the

benefits and press no claims separate from his…." (internal quotation marks omitted)); *TD

Props., LLC v. VP Bldgs., Inc.*, 602 F. Supp. 2d 351, 358 (D. Conn. 2009) ("[W]here a contract

contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary

is bound thereby to the same extent that the promisee is bound." (internal citation and quotation

marks omitted)); *Hickox v. Friedland*, No. 01-cv-2025 (JGK), 2001 U.S. Dist. LEXIS 19112, at

*28 (S.D.N.Y. Nov. 21, 2001) ("Third party beneficiaries of a contract will also be bound by an

arbitration clause under ordinary principles of contract."). Accordingly, as an intended third-

party beneficiary of the contracts, Plaintiff is bound by the arbitration clause.

Because Plaintiff's relationship to the contracts is, for present purposes, the same as that

of a signatory, this case begins to look very similar to a line of Second Circuit cases that

addresses whether a non-signatory to a contract containing an arbitration provision, i.e., here the

Defendants, may compel a signatory to that contract, i.e., here the Plaintiff, to arbitrate. *See

Choctaw Generation Ltd. P'Ship v. Am. Home Assur. Co.*, 271 F.3d 403 (2d Cir. 2001);

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d

Cir. 1999). The inquiry that the Second Circuit has instructed courts to undertake in this

situation is to determine whether the issues raised by the lawsuit are "intertwined" with the

underlying contract containing the arbitration clause. *See Stolt-Nielsen*, 387 F.3d at 177 ("Our

cases have recognized that under principles of estoppel, a non-signatory to an arbitration

agreement may compel a signatory to that agreement to arbitrate a dispute where a careful

review of the relationship among the parties, the contracts they signed, and the issues that had

15

arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." (internal quotation marks omitted)). As the Second Circuit has explained, *Stolt-Neilsen* imposes a two-part test for determining whether a non-signatory may compel arbitration against a signatory: (1) there must be intertwined factual issues between the claims asserted and the agreement containing the arbitration clause; and (2) there must be "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008).

The first part of this inquiry – the intertwinement of factual issues – is, as a practical matter, similar to the inquiry discussed earlier about whether the "dispute" in this case falls within the scope of the broad arbitration clause. That is, while the two inquiries address different issues, they boil down to an examination of the same considerations in this case. In particular, the question is to what degree the underlying contracts will figure in this litigation.[8] *See, e.g.*, *Stolt-Nielsen*, 387 F.3d at 178 (finding intertwinement of factual issues in a price-fixing case where the claimed injury arose from inflated price terms contained within a charter that had an

---

[8] Although this question does not turn on the law of the State of Texas, which is the governing law of the contracts due to the fact that the imaging centers are located there, the Court notes that Texas case law is consistent with Second Circuit case law on this issue. *See Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305-06 (Tex. 2006) ("Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory … Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.")

arbitration provision); *Choctaw*, 271 F.3d at 406 (finding intertwinement of factual issues where (1) the contract containing the arbitration provision was incorporated by reference into the contract under which the dispute arose and (2) the dispute concerned a party's obligations under the contract containing the arbitration provision). For the reasons explained above with regard to the scope of the arbitration clause, it is difficult to see how this action could unfold without the contracts playing a starring role. As noted, even if Plaintiff does not rely on the contracts to prove its case – which is doubtful, in light of its repeated allegations about being duped into paying out-of-network rates instead of the in-network rates mandated by the contracts – Defendants will surely raise the contracts as part of their defense, at the very least to argue that they should not, as a matter of equity, be required to reimburse Plaintiff for all amounts paid, but only for those amounts above and beyond those permitted by the contracts. Thus, once again, regardless of whether Plaintiff's *claim* implicates the contract, the *dispute* – the unit of arbitrability specified in the contracts – surely does. Accordingly, the Court finds that the factual issues in this dispute are intertwined with the contracts containing the arbitration clause.

The second part of the inquiry – whether there is a relationship among the parties that justifies compelling arbitration even though the party demanding arbitration is not a signatory to the contract containing the arbitration provision – is also satisfied. Although the case law does not specify precisely what kind of relationship is sufficient, *see Sokol Holdings*, 542 F.3d at 359 (noting that "the opinion [in *Stolt-Nielsen*] did not explain … what kind of relationship would favor a finding of estoppel"), review of the cases finding such a relationship demonstrates that the following factors are significant: (1) a close parent/subsidiary relationship; and (2) allegations by the plaintiff of conduct by both the signatory and non-signatory that give rise to the claim. *See Stolt-Nielsen*, 387 F.3d at 177 (finding a parent/subsidiary relationship sufficient,

17

particularly where the plaintiff alleged that the conduct underlying the claim was to be performed by the parent/non-signatory).

Here, those factors weigh in favor of a finding that Defendants' relationship to the imaging centers is sufficiently close to justify allowing Defendants to compel arbitration. First, Plaintiff alleges, and Defendants concede, that USI "owns and operates" the imaging centers and HSS serves as the administrator for USI. (See Compl. ¶¶ 13-14; Defs.' Mem. of Law in Supp. of Mot. to Compel. Arb. at 1.) Thus, Defendants and the imaging centers have a relationship similar to the parent/subsidiary relationship in *Stolt-Nielsen*. Second, Plaintiff alleges the non-signatory Defendants fraudulently billed for services that were actually provided by the signatory imaging centers. (See Compl. ¶¶ 21-26.) Thus, the conduct underlying the claim involved both signatory and non-signatory parties, much as it did in *Stolt-Nielsen*. The relationship between the non-signatory Defendants and the imaging centers that signed the contracts is sufficient to permit Defendants to compel CGLIC to arbitrate its claim.

In sum, Defendants are entitled to compel arbitration against Plaintiff.

### C. Whether the Contract Containing the Arbitration Clause Has Been Terminated Is a Question for the Arbitrator

Plaintiff also argues that before making any ruling compelling arbitration, the Court should permit the Plaintiff to conduct discovery regarding Defendants' reported assertion that the underlying CIGNA Healthplan of Texas, Inc./imaging center contracts were terminated. Plaintiff's theory is that, if the contracts were terminated, then the arbitration clause is no longer in force and Plaintiff cannot be compelled to arbitrate its claim. The case law, however, forecloses this argument. Where there is a broad arbitration clause, the arbitrator resolves any claim of contract termination. *See Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 929 (2d Cir. 1990) ("[T]he arbitrator should determine any

claim of contract termination under a broad arbitration clause….”); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir. 1980) (“In determining whether this issue of contract termination is arbitrable, a court must first examine the potential scope of the agreement to arbitrate. If the arbitration clause is broad and arguably covers disputes concerning contract termination, arbitration should be compelled and the arbitrator should decide any claim that the arbitration agreement, because of substantive or temporal limitations, does not cover the underlying dispute.”) As discussed above, the arbitration clause at issue here is broad and, therefore, Defendants’ assertion that the CIGNA Healthplan of Texas, Inc./imaging center contracts were terminated presents an issue to be resolved by the arbitrator. Accordingly, any discovery on that issue should be conducted in the arbitration proceedings, and not in this action.

## III.    Conclusion

For the reasons discussed above, the Court GRANTS Defendants’ Joint Motion to Compel Arbitration [Dkt. # 30]. Rather than staying this action pending arbitration, the Court exercises its discretion to dismiss this case.[9] *See Pearl Seas Cruises*, 2012 U.S. Dist. LEXIS 46162 at *15. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              August 29, 2013

---

[9] This Decision is “an official dismissal of all claims.” *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 363 (2d Cir. 2003).